**SHAFFER v. UNITED STATES.**
No. 48885.
United States Court of Claims.
Decided June 8, 1954.

Thurman Arnold and Norman Diamond, Washington, D. C., for plaintiff. Arnold, Fortas & Porter, Washington, D. C., Sterling Holloway, Fort Worth, Tex., Abe Krash, Washington, D. C., and L. A. Nikoloric, Portland, Ore., were on the briefs.

Kendall M. Barnes, Washington, D. C., with whom was Warren E. Burger, Washington, D. C., Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

The plaintiff is the trustee in bankruptcy of Texasteel Manufacturing Company. He has been authorized by the bankruptcy court to bring this suit. It is a suit for damages for alleged breach of contract and taking of the bankrupt's property by the United States, acting through the Bureau of Ordnance of the Navy Department. For convenience of expression, the bankrupt will be called the plaintiff in this opinion.

The plaintiff's corporate stock was owned entirely by members of the Armstrong family. In 1940 it made a contract with the War Department to manufacture shells at the plaintiff's plant in Fort Worth, Texas. From that time until the end of the war it produced shells at that plant efficiently, and at a large profit to itself.

In February 1941, the plaintiff requested the Bureau of Ordnance, Navy Department, to put the plaintiff on its

list of prospective suppliers of shells, including the 5-inch shells, to the Navy. The plaintiff said that its facilities were presently engaged on the Army work, but that they might be available in the future. The Navy inspected the plaintiff's plant and advised it that it could not qualify as a satisfactory source of Navy supply unless it proposed to expand its facilities. The plaintiff, by letters and in oral conversation advised the Navy of additions which it could make to its facilities if it could get substantial contracts to supply shells to the Navy. On April 25, 1941, the Navy wrote the plaintiff acknowledging the receipt of the plaintiff's statements about the proposed additions to its facilities, and saying that it would give the plaintiff an opportunity to bid on its work. The Navy sent bid forms to the plaintiff, and the plaintiff on May 6 returned them without a bid saying that it hoped by about May 20th to be able to make bids, but whether it could do so or not would depend upon whether and when it could get certain equipment which it was negotiating for. On May 7 the plaintiff sent the Navy a copy of a letter which it had written to the predecessor of the War Production Board in which it discussed expanding its and its parent company's Fort Worth facilities and also building other facilities at a new location, naming Beaumont, Port Arthur and Texas City, Texas, as advantageous places. The proposed construction included a new steel mill to produce the steel from which shells would be made. The letter said that the plaintiff could not finance the proposed expansion without Government aid. It said that the Emergency Plant Facility Plan had been suggested as an alternative. The plaintiff apparently desired advice as to whether such construction would be permitted.

On May 19, 1941, the plaintiff made a contract with the Beyster Corporation for the architectural services incident to the erection of a steel mill. The architect's services were to include the preliminary survey, detailed layout for contractor's bids, and supervision of construction.

On May 22, 1941, the plaintiff submitted a bid to the Navy on 114,000 5-inch shells at a unit price of $12,744 with deliveries to be completed by July 1, 1942. This bid was accepted on June 6, though it was not the lowest bid, because other lower bidders could not meet the required delivery schedule, insisted on larger quantities than the invitation called for, or stated that Government-furnished facilities would be required. The plaintiff's bid gave no indication that Government-furnished facilities would be required.

On June 5, the plaintiff by letter offered to supply 20,000 6-inch projectiles at $25.00 apiece, deliveries to commence in January 1942, or as soon thereafter as possible, contingent upon the delivery of certain named equipment for which it was negotiating. In another letter of June 5 the plaintiff asked that if it received the award of either the 114,000 shell contract or the 20,000 shell contract it be given a certificate of necessity and a certificate of nonreimbursement, as well as an advance payment. These certificates, as we understand them, were assurances that the contractor had built the facilities with its own money, and were to enable it to take accelerated depreciation on the facilities, for income tax purposes.

In still another letter of June 5 the plaintiff urged expeditious action on its application for advance payment so that the advanced money would be available to pay for the acquisition and transportation of the necessary equipment, in order that production might be started without delay. In still another letter of June 5 the plaintiff described in detail the plaintiff's facilities, actual and planned, for the production of shells and shell forgings. This letter was in response to a verbal request for such a description. This letter described the proposed new South Texas plant as having been planned and designed for the production of 5-inch or 6-inch Navy shells. It estimated that the steel plant would

produce 12,000 tons of billet steel monthly; that the hydraulic presses would produce 110,000 forgings monthly, and that the machine tools which had been designed, and could be completed within six months, would completely machine the shells at that same rate.

On June 7, 1941, the plaintiff bid for the supply of 300,000 or 500,000, or 750,000, 5-inch shells at stated prices. It offered to commence deliveries in January 1942, and continue them at the rate of 100,000 per month until completion of the contract. The bid said "An investment by our company of approximately $1,000,000 will be entailed in the purchase of" certain necessary named facilities. It also said "Architect-engineers engaged for the purpose will undertake complete installation of plant in five months from date."

Three contracts were let to the plaintiff between June 6 and June 21, 1941. The one for 114,000 5-inch shells was designated NOrd–153 and called for completion of deliveries by July 1, 1942. The one for 20,000 6-inch shells was designated NOrd–150 and called for delivery of 2,000 shells by January 1942, and 2,000 shells per month thereafter. The third one was for 250,000 5-inch shells, was designated NOrd–171 and called for deliveries to be completed by October 1942. The plaintiff furnished a performance bond, in a designated amount for each contract, written by Seaboard Surety Company.

Contracts NOrd–153 and NOrd–150 contained agreements by the Government to advance not to exceed 30 percent of the contract price to the contractor. On July 1, 1941, the plaintiff requested an advance of $435,844.80 on NOrd–153. In its request it enclosed the advance payment bond of the Seaboard Surety Company. It stated by items what it needed the money for, viz., specified equipment and the cost of transporting it. It said that in addition to this money, and $150,000 which it was requesting to be advanced under contract NOrd–150, it would obtain the balance of the deeded $1,000,000 by a loan of $500,000 from the Reconstruction Finance Corporation, secured by a first mortgage loan on plant and realty. It further said:

"The H. E. Beyster Corporation, Detroit, Michigan, has been engaged under the usual form of contract for such services, to engineer and supervise the construction of this plant. The engineers estimate that the plant can be installed and placed in production within five months from the date of commencement."

The requested advances on the two contracts were made by the Government.

In its negotiations with the RFC for a loan, the RFC set proposed terms for repayment of the loan which terms the plaintiff was not willing to agree to. The plaintiff on July 19, 1941, advised the Navy of this development but said that the plaintiff was prepared to go ahead with the construction of the plant, and to complete it by December 1. The plaintiff said:

"Funds from advanced payments on contracts will be applied to this purpose, pending either a RFC loan on acceptable terms or the execution of the Defense Plant Corporation plan. As stated in the beginning of this letter the latter course appears now to us to be the most desirable in which we trust you concur."

The Defense Plant Corporation plan, as we understand it, was that the plant would be built with funds advanced by that agency, would, when built, be owned by the Government, and would be leased by it to the contractor for his use in defense production. Before the Defense Plant Corporation would undertake a project it had to be recommended by the Office of Production Management and either the War or Navy Department.

The plaintiff on August 5, 1941, submitted a proposal to the Navy for either a Defense Plant Corporation arrangement, or a Government ownership arrangement, under which the Government would acquire from the plaintiff, at cost, either the entire plant, as completed and to be completed, at a cost of approxi-

mately $1,000,000, or only the equipment already acquired and that to be acquired and installed in the forge and machine shops, at a cost of $522,050. Under either alternative, the plaintiff would reduce the contract price of the shells.

As to the steel mill which the plaintiff planned in connection with the Port Arthur project, neither the RFC nor the Defense Plant Corporation would put money in it, and the plaintiff in 1942 abandoned that part of its project.

On August 20 and 21, 1941, conferences were held by the Navy and the plaintiff for the purpose of negotiating a so-called "facilities contract" for the forge and machine shop at Port Arthur. The War and Navy Departments had authority to pay over, out of their appropriated funds, to contractors the cost of constructing facilities for the production of war materials. The facilities were to be paid for at their true cost, and were, of course, to be owned by the Government. H. E. Beyster, whose architectural firm had a cost-plus-a-percentage-of-cost contract with the plaintiff for the construction of the plant, including the steel mill, was present. If the "facilities contract" was made, he was to be a subcontractor of the plaintiff, which would be the prime contractor with the Government. It was agreed that he would have a fixed fee rather than a percentage of the cost of the work.

Article 1 of the facilities contract as later entered into was as follows:

"Article 1. *Scope of Contract.*— The Contractor shall with due expedition, by contract with others or otherwise, acquire and install or construct the machinery, equipment, facilities, services and appurtenances identified in Appendix A attached to and forming a part of this contract (and hereinafter sometimes collectively referred to as 'the facilities' or 'the Department-owned facilities'), furnishing or causing to be furnished the labor, materials, tools, machinery, equipment, facilities, supplies and services, and doing or causing to be done all other things necessary for the acquisition, installation and construction thereof. All of the said facilities shall be in accordance with the drawings, specifications, descriptions and instructions set forth in Appendix A."

Article 3 of the contract provided that the contractor should submit for approval by the Navy plans, specifications, lists of machinery, etc., proposed to be used.

On September 5, 1941, the plaintiff formally requested approval by the Navy of the plans and specifications prepared by Beyster for the forge and machine shop, and of the subcontracts proposed to be made with Beyster for the architectural services, and with the proposed building contractor. These approvals were given by the Navy.

On October 14, 1941, the contemplated facilities contract was made between the plaintiff and the Navy. It was designated NOrd–2350. In the meantime, on October 4, 1941, contract NOrd–171 was amended by a change order. The first two paragraphs of the change order were as follows:

"When the above identified contract, NOrd–171, was entered into, the Contractor contemplated procuring the steel from external sources, and installing certain facilities with its own, or borrowed, funds.

"Due to difficulties in financing, the Contractor has requested this Bureau to provide additional forging facilities by means of a Government ownership type of facilities contract. It is the opinion of this Bureau, based on investigation, that a shortage in forging facilities exists particularly in the southwest, and that an expansion in these facilities is necessary in the interest of National Defense. The estimated cost of the expansion of facilities to be the subject of a Government ownership contract is $550,000.00."

The change order then said that the prices in the plaintiff's three supply contracts had been agreed upon on the assumption that the contractor would sup-

ply its own facilities, and since a contract was now going to be made under which the Government would supply the facilities, the contract prices of the three contracts would be reduced by a total of $103,125, all of which would, for convenience, be deducted from the contract price of NOrd–171.

Since the facilities contract was not made until ten days after the change order, the recital in the fourth whereas clause of the facilities contract, that the Navy and the plaintiff had entered into or were entering into contracts on the understanding that the facilities required for performance would be provided by the Navy, was true.

Work on the forging and machine shop plant began on October 22, 1941. In the meantime, the plaintiff had been going ahead with the steel mill, and had used for that purpose money which it received as advance payments on its supply contracts with the Navy. This was a departure from the representations which it had made in its applications for the advance payments. It continued to seek financing for the steel mill from the RFC and the Defense Plant Corporation. On December 15, 1941, the plaintiff advised the Navy that, barring unforeseen contingencies, the shell plant would be ready for operation in early February. On December 30 the plaintiff telegraphed the Navy that, based upon the promised delivery to it of the necessary steel and the machine tools ordered, it could finish 40,000 shells by May 1942. On January 1, the Navy complained of the delay in promised delivery. The plaintiff then sent a delivery schedule which indicated, subject to stated contingencies, large daliveries beginning in March.

On February 10, 1942, the Chief of the Bureau of Ordnance of the Navy wrote the Seaboard Surety Company, sending a copy of the letter to the plaintiff, advising it that the ability of the plaintiff to perform its contracts was in serious question, and that under one of its contracts deliveries were already in default. The plaintiff, because it had expended on its steel mill the funds advanced by the Government on two of its contracts, was handicapped by a lack of working capital. It had stated that it would not ask for an advance on NOrd–171, and hoped to borrow $900,000 from private sources on that contract. It did not succeed in doing so. An official of Seaboard Surety, on February 26, 1942, asked the Navy to make a 20 percent advance to the plaintiff on NOrd–171. This was done.

In March 1942 it began to appear that the forge and shell plant would not work. The hydraulic pumps were not strong enough to operate the forging equipment. The heat treating equipment would not work and had to be replaced with new equipment, which would take 10 to 12 weeks to get. There were other deficiencies with regard to the handling and other equipment. Several Navy inspectors in succession inspected the plant and each made a discouraging report about prospects for production. By March 23, 1942, the plaintiff had spent all of the $550,000 which had been named in the facilities contract as the estimated cost of construction. On April 1, 1942 the plaintiff submitted to the Navy an estimate prepared by the architect Beyster, that $860,146 worth of additional facilities would be required to put the plant in operation. The plaintiff and the Navy conferred in Washington. Several possible courses of conduct were discussed.

Seaboard Surety Company had, on March 28, 1942, obtained from the Armstrongs, stockholders of both the plaintiff and its parent company, the Texas Steel Company, a pledge of all the stock of both companies to indemnify Seaboard against liability on the bonds which it had signed for the plaintiff. The pledge agreement provided that in the event the Government declared a default on any of the bonded contracts, or in the event the Government advised Seaboard that a change in management, supervision or policy of either of the companies was necessary in order to obviate the declaration of a default, Seaboard could vote the stock of the two

companies, elect officers and directors, and control the management of the companies.

After much consideration inside the Department it was decided to advance the entire additional $860,146 if certain conditions were fulfilled. Before agreeing to do so the Navy required the Surety Company to reaffirm its liability on all its bonds relating to the plaintiff's contracts.

On June 2, 1942, the Navy received a report made by a civilian employee of the Navy, who had been sent by the Chief of the Bureau of Ordnance to inspect the Port Arthur plant and make recommendations. He recommended that the additional facilities be granted the plaintiff on condition that George W. Armstrong, Sr., chairman of the board, Allen J. Armstrong, president, and John Foster, financial officer of the Port Arthur plant, be removed from any positions of authority in the company.

On June 5 the Chief of the Bureau of Ordnance wrote Seaboard saying that G. W. Armstrong, Jr., should be made president of the plaintiff company, that the three men named in the preceding sentence be removed from any office which would give them any authority over the performance of the plaintiff's Navy contracts, that the two Armstrongs there named be dropped from the Board of Directors, that Seaboard have a representative on the board and that an impartial third person be added. The letter said:

"This Bureau suggests that the changes referred to above be effected through your inchoate power under the escrow agreement covering the stock of the companies."

At the suggestion of Seaboard the letter of June 5 was withdrawn and another letter was written, as follows:

"By reference (a), it was required that before proceeding with providing the additional facilities and machinery referred to therein, your company would undertake to see that the management of the Con-

tractor is adequate to carry out and perform the subject contracts. In this connection this is to inform you that this Bureau does not consider Mr. G. W. Armstrong, Sr., Mr. A. J. Armstrong [Jr.] and Mr. John Foster as acceptable persons to occupy managerial or directive offices in the performance of the subject contracts. If your company considers Mr. G. W. Armstrong, Jr., the proper person to occupy the office of the President and General Manager or other top active executive position in the Company, this Bureau offers no objection to such appointment subject to judgment on performance.

"Before final authorization and approval of the additional facilities and machinery, this Bureau wishes to be advised that the Contractor has placed in effect an acceptable organization. You are also requested to keep this Bureau advised by regular periodic reports of progress under the subject contracts."

T. V. O'Neill, the Seaboard official who had discussed the matter with the Navy then went to Texas to discuss the situation with the plaintiff's officers and stockholders. They balked at the suggestions of the letter, and considered abandoning their Navy contracts and taking the loss but Seaboard said that if they did that, it would exercise its powers under the pledge-agreement and take control of the two companies. After further discussion it was resolved that control of all operations at Port Arthur would be put into the hands of a Management Committee, to consist of George W. Armstrong, Jr., T. V. O'Neill, and a representative of the Navy, if the Navy desired to appoint a representative to serve on the committee. The resolution provided that the arrangement should remain in effect until its rescission was approved in writing by Seaboard and the Navy. Seaboard advised the Navy of this action on June 16, 1942. The Navy advised Seaboard that this arrangement would be considered satis-

factory until proved otherwise by experience.

On July 8, 1942, the facilities contract was amended to increase the limit of cost to $1,409,455, to extend the estimated date for completion to January 1, 1943, and to provide for the repayment by the plaintiff to the Government of all expenditures in excess of $1,000,000, the repayment to be made by applying half of the plaintiff's net profits after payment of taxes, loans and advances.

The plaintiff produced 500 5-inch shells by June 1, 1943, 1,500 in June and July, 3,000 in August, 4,500 in September and 3,000 in October. In February 1944, the plaintiff submitted an estimate of proposed production for 1944, but its actual production fell far short of its estimate, and there were many shells rejected as defective. On June 28, 1944, the Navy gave the plaintiff notice of termination of one of the contracts, NOrd–150. That would have required the plaintiff to pay back the advance which it had received on that contract, on which it had delivered no shells. The plaintiff's financial condition was desperate, and the only way it could finance its current operations was by being given a moratorium upon the repayment of the advances received on all its contracts. The plaintiff and Seaboard protested the termination, and a meeting was held. In the discussions in the meeting, the plaintiff expressed the hope of greatly increasing its production. The Navy said that it would grant a moratorium on the repayment of the advance payments on all the contracts until November 1, 1944, provided that the plaintiff get its production rate up to 32,000 shells per month by that time, and show its ability to produce 39,000 shells per month thereafter. It said that it would withdraw its notice of termination of NOrd–150, and would withdraw its objection to the participation of A. J. Armstrong and George W. Armstrong, Sr., in the management of the plaintiff.

Immediately following this conference, a letter summarizing the results of the conference was sent by the Navy to the plaintiff, with a copy to Seaboard. The letter contained the following paragraph:

"(7) That the surety company on your bonds consents and agrees to the amendments, including the amendment regarding moratorium on amortization of advance payments under contract NOrd–171 referred to above, and the surety and your Company restate their respective liabilities as principal and surety on all bonds executed in connection with the subject contracts without qualification or exception, as though said bonds had been re-executed and delivered *de novo* as of the date of execution of said amendments."

The plaintiff by a letter of August 14, protested the inclusion of the above language, and, in a letter to a banker, with a copy to the Navy, the plaintiff placed the responsibility for its losses on Seaboard which, the plaintiff said, acted on the demand of the Navy in displacing the plaintiff's management in the Port Arthur plant.

On August 18, 1944, on the petition of Seaboard and other creditors, a trustee in bankruptcy was appointed for the plaintiff. On August 22 the Chief of the Bureau of Ordnance wrote the plaintiff, with copies to Seaboard and the trustee in bankruptcy challenging the position which the plaintiff had taken in its letter to the banker, and demanding full performance of the contracts promptly to the full admitted capacity of the facilities provided, and stating that unless such performance was forthcoming, the contracts would be canceled for default, and liability for the default would be placed on the plaintiff. Thus the agreement for a moratorium was never completed.

Since the plaintiff, the Texas Steel Company, and the members of the Armstrong family were asserting that Seaboard was responsible for the plaintiff's losses, and denying their liability to indemnify Seaboard for payments which it would have to make on its bonds, Sea-

board sought and obtained on May 2, 1945, in the United States District Court for the Northern District of Texas, a declaratory judgment that the idemnity agreements were valid. The court also held that Seaboard was not liable to these parties for any losses arising out of the Port Arthur operations. Subsequently, on January 12, 1946, a judgment for the payment of money to Seaboard was entered. This judgment was affirmed *per curiam*, by the Circuit Court of Appeals for the Fifth Circuit. Texasteel Mfg. Co. v. Seaboard Surety Co., 158 F.2d 90.

The plaintiff suffered large losses in connection with the transactions narrated above. It claims that the United States caused those losses, and is legally responsible for them. It says that, to the extent that the losses were caused by the inadequacies of the Port Arthur facilities, the fault is the Government's because it was bound to furnish adequate facilities. The plaintiff says that from the beginning of negotiations, it was understood that the facilities would have to be provided by the Government. That is not the fact. In the discussions and correspondence there was frequent mention of an RFC loan or a Defense Plant Corporation construction, but there was also frequent mention of Certificates of Necessity and Non-Reimbursement, which presupposed private financing. Even if it had been assumed that one of the several possible forms of Government financing would have to be used, that would have put no responsibility on the Navy Department for the use of the money obtained, and the adequacy of the facilities obtained with the money.

When the three supply contracts were entered into, several months after the beginning of negotiations, there was no provision, either express or assumed, that the performance of the contracts was conditioned upon the furnishing by the Navy, or by the Government, of facilities. There was still collateral mention of a Government loan or financing, but there were also the direct statements referred to above which assumed that the

construction of the facilities would be privately financed.

The arrangement was changed, and the Navy undertook to provide facilities because it became obvious that the plaintiff was not going to be able to do what it had contracted to do unless the Navy provided facilities. The amendment of the supply contracts expressly stated that the contracts as originally made had contemplated that the contractor would supply its own facilities. The facilities contract, made in October 1941, was made after the plaintiff and the Beyster firm of architects, chosen by the plaintiff, had presumably been working for several months on the plans and specifications for the facilities. The Navy had a right to assume that those plans, made for the plaintiff which was already experienced in producing shells successfully for the Army at its Fort Worth plant, were adequate. The plaintiff makes something of the point that it sent Beyster's plans on to the Navy without looking at them. Beyster was the plaintiff's man and, as it turned out, it was a reckless thing for the plaintiff to do to repose such confidence in him. But that was the plaintiff's recklessness, and it cannot be passed over to the Government. It was the plaintiff that was going to have to use the plant, to fulfill its contracts to make shells, and it should have seen to it that the plant as designed would produce shells as called for by its contracts.

The estimated cost of the facilities which the plaintiff was asking the Navy to pay for proved to be much less than half of what turned out to be the actual cost. While the plaintiff expressly refrained from warranting the accuracy of the estimates, neither party assumed that the estimated cost would have no relation whatever to the actual cost. The Navy did not agree that it would put up money, without limit, to construct facilities. It finally did put up the additional money, because of its great need for shells, and because of the time and money that had already been sunk in the venture.

The Navy concluded, rightly it would seem, that the whole affair had been incompetently managed by the plaintiff. It felt compelled, by the necessities referred to above, to pay out more additional money than what it had already paid out. It was its duty to try to see that, this time, it got for the Government's money what it had been led to expect to get before. It urged the Surety Company, which had a legal right to exercise control over the plaintiff's management, to exercise that right. The Surety Company, which was being victimized by the same incompetent management, was in no sense bound to follow the recommendation of the Navy. It did not, in fact, follow it, but worked out with the plaintiff the scheme of a Management Committee. The results were not good, but they couldn't have been worse than they had been before the change.

One who is bedeviled, as the Navy, was, by the persistent failure of another to do what he has agreed to do, does not lose his rights under the contract, nor become liable for the other party's losses, by complaining of what he regards as incompetent management and demanding a change to what he thinks would be better management. If he is a seafaring man, as was the Chief of the Bureau, it is not surprising if he uses florid language of the Captain Kidd variety, in demanding the change.

Many of the plaintiff's difficulties resulted from the fact that it had no working funds with which to finance its performance. The advance payments on its contracts had been used up months before it was ready to produce any shells, for purposes which had no direct relation to the production of shells. The Navy, too indulgently, permitted this to be done, the plaintiff did it, and there is no reason why the Government should have to pay for the plaintiff's misjudgment.

The whole Port Arthur transaction was a costly misfortune for the plaintiff. It sought, in the District Court litigation referred to above, to shift its losses to the Surety Company. It did not succeed in doing so. In this litigation it seeks to shift them to the Government. It seems to us that the only way the Government could have prevented the plaintiff's losses would have been by foreseeing that the plaintiff could not perform the contracts which it ardently sought, and refusing to make the contracts.

The plaintiff is entitled to recover for transportation taxes paid by it for which the Navy agreed to reimburse it. It may have a judgment for $3,544.71.

It is so ordered.

JONES, Chief Judge, and LARAMORE, WHITAKER and LITTLETON, Judges, concur.